# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LEISURE HOSPITALITY, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> HUNT PROPERTIES, INC.; SFM GP, LLC; ) <br> and SF CROSSING INVESTORS, LTD now ) <br> SF CROSSING INVESTORS, L.P., ) <br> ) <br> Defendants. ) | Case No. 09-CV-272-GKF-PJC |

## OPINION AND ORDER

This matter comes before the court on defendants' Motion to Dismiss Plaintiff's Second Amended Complaint. [Doc. No.116]. For the reasons set forth below, the motion is granted in part and denied in part.

### I. Background/Procedural History

This suit arises from the sale by defendant SF Crossing Investors, Ltd. ("Crossing") of land in the Smith Farm Shopping Center in Owasso, Oklahoma, to plaintiff Leisure Hospitality, Inc. ("LHI"). LHI sued defendants in Tulsa County District Court, alleging they negligently failed to convey the property free of encumbrances that would prevent or impair Leisure from constructing the hotel the parties contemplated would be built and operated by Leisure on the property. [Doc. No. 2-1, Petition, ¶16]. Defendants removed the case to federal court based on diversity jurisdiction and subsequently filed a Motion for Summary Judgment, arguing LHI's negligence claim was barred, as a matter of law, by the parol evidence rule. [Doc. No. 20]. The court granted defendants' Motion for Summary Judgment, but gave LHI leave to file an Amended Complaint. [Doc. No. 56]. LHI's First Amended Complaint [Doc. No. 58] asserted a

claim for fraud. The court denied defendants' Motion to Dismiss the complaint, finding the First Amended Complaint met the heightened pleading standards required for fraud by Rule 9(b) and the requirements of Rule 8(a)(2) as explained in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

Subsequently, the court granted LHI's motion for leave to file a second amended complaint. [Doc. #110]. LHI's Second Amended Complaint reasserted the fraud claim and added claims for breach of contract against defendant SF Crossing Investors, now SF Crossing Investors, L.P. ("Crossing") and for constructive fraud against defendants Crossing, SFM GP, L.L.C. ("SFM") and Hunt Properties, Inc. ("Hunt"). Defendants seek dismissal of the Second Amended Complaint in its entirety.

## II. Fraud Claim

The fraud claim in the Second Amended Complaint is virtually identical to the fraud claim in the First Amended Complaint, which the court previously declined to dismiss [Doc. #109]. Defendants have raised no new argument or authority persuading the court to reconsider its earlier ruling. Therefore, the Motion to Dismiss is denied with respect to the fraud claim.[1]

---

[1] Defendants contend the Second Amended Complaint fails to allege facts showing LHI reasonably relied on alleged misrepresentations by defendants. However, Fed.R.Civ.P. 9(b) does not require that reasonable reliance be pled in the complaint. Further, under Oklahoma law, the elements of common law fraud claim are: 1) a material misrepresentation, 2) knowingly or recklessly made, 3) with intent that it be relied upon, and 4) the party relying on the false statement suffers damages. *Silver v. Slusher,* 770 P.2d 878, 881 n.8 (Okla. 1988). Defendants' assertion that LHI did not reasonably rely on alleged misrepresentations is not appropriate in a motion to dismiss.

### III. The Allegations of Breach of Contract and Constructive Fraud Claim in the Second Amended Complaint

With respect to the breach of contract claim, the Second Amended Complaint alleges that in November 2005, Jim Shindler ("Shindler"), the Vice President of Hunt Properties, Inc. and an agent of defendants, advised Robert Patel ("Patel"), the president of Leisure Hospitality, Inc. ("LHI"), that before the parties could enter into a purchase and sale agreement for the Property, defendants would need to get the consent and approval of Target Corporation ("Target"), the anchor tenant of the Smith Farm Shopping Center, and others with an ownership interest in the Smith Farm Shopping Center, to permit development of the hotel LHI proposed to build on the property at issue, but that he did not foresee any difficulties in obtaining Target's approval. [#111, Second Amended Complaint ¶10]. Patel asked Shindler if he anticipated any problems in obtaining approval and consent from others with an ownership interest in the Smith Farm, and Shindler assured Patel he did not foresee any problem with obtaining such approvals and consents. [*Id.*].

LHI alleges, "In November 2005, Shindler, acting on behalf of Crossing, and pursuant to agreement with LHI, set about obtaining approvals and consents of Target Corporation and others with an ownership interest in the Smith Farm Shopping Center to permit construction of the Proposed Hotel. Such conduct by Shindler (and/or others acting on his behalf) was meant to induce LHI to enter into a purchase and sale agreement with Crossing for the Property (the "Agreement")." [*Id.,* ¶27]. LHI alleges, "Fulfillment of the agreement by Shindler, on behalf of Crossing, to obtain approvals and consents of Target Corporation and others with an ownership interest in the Smith Farm Shopping Center to permit construction of the Proposed Hotel on the Property was a material term of the Agreement between LHI and Crossing for the purchase and

3

sale of the Property."  [*Id.,* ¶27].

LHI alleges that on either November 28 or 29, 2005, Shindler called Patel and advised that defendants had received all approvals and consents necessary to permit LHI's development of the proposed hotel on the property except Target's. [*Id.,* ¶28]. On December 6, 2005, Shindler advised Patel in writing that defendants had received the approval and consent of Target and, thus, the parties could move forward with preparing the Agreement, and that defendants would begin drafting the Agreement; defendants did, thereafter draft the Agreement. [*Id.*].

The Second Amended Complaint alleges §7.1.1 of the Agreement addresses, among other things, the promises, assurances and representations made by Shindler and defendants to LHI in November 2005. [*Id.,* ¶29].  That section of the Agreement provides:

> 7.1.1    Prior to Closing, Seller shall obtain all such written consents and approvals as may be required in order to permit Seller to perform its obligations under the Agreement.

[Doc. #111-1, Ex. B, Agreement]. The Second Amended Complaint further alleges, "Nowhere in the Agreement are any specific "written consents and approvals" identified as those to be obtained by the Seller (Crossing), pursuant to Section 7.1.1.  The only provision in the Agreement where 'written consents and approvals' are identified is in Section 5.2, which provides: '<u>Purchaser</u> shall . . . obtain (i) written approvals from Hilton Hotels Corporation for a Hampton Inn & Suites in the City of Owasso, Oklahoma; and (ii) approval of the City of Owasso for use of the Property as a Hampton Inn & Suites...'" [Doc. #111, ¶29].

The Second Amended Complaint also cites §11.10 of the Agreement, which states:

> 11.10   In addition to the acts and deeds recited here and contemplated to be performed, executed and/or delivered by Seller and Purchaser, Seller and Purchaser agree to perform, and/or deliver or cause to be performed, executed and/or delivered at the Closing or after the Closing any and all such further

4

acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby in accordance with the terms hereof.

[Doc. #111-1, Ex. B, Agreement]. The complaint alleges, "Thus, the Agreement expressly provides that Seller will undertake acts in addition to those expressly provided for in the Agreement as may be necessary to consummate the transaction contemplated in the Agreement. The transaction contemplated in the Agreement, as identified in Section 5.2 was the purchase and sale of the Property for development of the Proposed Hotel, the parameters of which had been disclosed in all material respects to Defendants in October 2006."[2] [Doc. #11, ¶30]. The complaint further alleges that following execution of the Agreement Shindler "attempted to modify the EC&Rs by way of the Second Amendment,[3] and delivered the Second Amendment for filing in connection with the closing. The Second Amendment was filed immediately before the deed conveying the subject Property to LHI."

The Second Amended Complaint alleges that "[a]fter the 'Inspection Period' and 'Review Period' as defined in the Agreement, and after LHI's ability to terminate the Agreement if LHI determined the Property was not suitable for LHI's intended use had expired, Crossing,

---

[2]"2006" appears to be a scrivener's error. The previous allegations in the Second Amended Complaint refer to communications in October-November 2005.

[3]Previous filings in this case indicate that defendant Crossing filed a "Declaration of Easements, Covenants and Restrictions" in the Tulsa County Public Land Records on October 27, 2004, and a "First Amendment to Declaration of Easements, Covenants and Restrictions" in the land records on March 28, 2005. [Doc. #20, Defendants' Statement of Undisputed Facts, ¶¶ 9-11 and Exs. 7-8 thereto]. Thus, the term "EC&Rs" in the Second Amended Complaint refers to Easements, Covenants and Restrictions filed in the land records and the term "Second Amendment" refers to an amendment of the First Amendment to Declaration of Easements. LHI alleges the Second Amendment was "an amendment to the EC&Rs intended to permit the Proposed Hotel to be developed on the property," that it was "finally executed by all requisite property owners as of May 17, 2006," and that the Second Amendment was filed of record in the county land records on June 8, 2006. [Doc. #111, ¶18].

through Shindler, entered into the Second Amendment which affected the easements, covenants and restrictions governing the subject Property and filed the same of record after closing and immediately before the deed conveying the Property to LHI was filed. LHI was not asked to and did not give prior written consent to the Second Amendment." [Doc. #111, ¶32].

LHI alleges defendants breached the Agreement in three ways:

> *First,* Crossing breached the agreement entered into with LHI in November 2005, whereby Defendant would obtain approvals and consents of Target Corporation and others with an ownership interest in the Smith Farm Shopping Center so as to permit construction of the Proposed Hotel and thus, execution of an agreement whereby LHI would purchase the Property, by either (a) failing to take reasonable steps to fully and properly document such approvals and consents and in the process resolving restrictions imposed on such development by the EC&Rs, or (b) failing to obtain such approvals and consents as would permit LHI to build the Proposed Hotel. Such "written consents and approvals' are referenced and contemplated in the Agreement at Section 7.1.1. *Second*, Crossing breached its obligations under Section 11.10 of the Agreement to perform such additional acts and to deliver at closing, any and all such further acts, deeds and assurances as may be reasonably necessary to consummate the transaction at issue. Crossing did, in fact, effect an amendment pursuant to the EC&Rs, after execution of the Agreement, with the purpose of permitting construction of a hotel. However, Crossing breached its obligations under Section 11.10 by failing to amend the EC&Rs so as to permit construction of the Proposed Hotel. *Third,* Crossing breached Section 7.1.2 of the Agreement by preparing, obtaining signatures on and filing the Second Amendment of record immediately before filing the deed conveying the Property to LHI, after the expiration of the Inspection Period and the Review Period, and without first obtaining prior written consent of LHI to such "arrangement pertaining to the Property" as was embodied in the Second Amendment.

[*Id.* at ¶33].

With respect to the constructive fraud claim, LHI reiterates its allegations that in November 2005, Shindler told Patel defendants would need to obtain the consent and approval of Target and others with an ownership interest in the Smith Farm Shopping Center to permit development of the proposed hotel on the property, that on November 28 or 29, 2005, Shindler

6

advised Patel defendants had received all approvals and consents necessary to permit LHI's development except Target's, and on December 6, 2005, Shindler, on behalf of defendants, advised Patel in writing that Target's approval and consent had also been obtained and "based on this we will have a contract drafted." [*Id.* at ¶36]. LHI alleges that at no time prior to the execution of the Agreement on January 25, 2006, did Shindler or any other representative of defendants disclose to LHI "that all material steps necessary to obtain the subject approvals and consents had not been taken." [*Id.* ¶37]. LHI alleges that on January 12, 2006, defendants entered into a letter of intent with Heitman Capital Management, LLC, believed to be the broker for Smith Farm/Florida, LLC, for the sale of substantially all of the remaining parcels of property in the Smith Farm Shopping Center, and the sale closed April 5, 2006. [*Id.*]. LHI alleges, "At no time prior to execution of the Agreement did Defendants disclose to LHI they would need to also obtain the approval and consent of Smith Farm/Florida, LLC, an additional entity with an ownership interest in the Smith Farm Shopping Center, so as to permit construction of the Proposed Hotel." [*Id.*].

LHI further alleges that at all times material, LHI made clear to defendants that LHI's purpose in seeking to purchase the property was to construct the proposed hotel on the property. [*Id.,* ¶38]. Further, "The agreement, representations and promises made by Defendants to LHI to induce LHI to enter into the Agreement (i.e., that Defendants would obtain approvals and consents of Target and from others with an ownership interest in the Smith Farm Shopping Center to permit LHI to construct the Proposed Hotel), was a material term of the Agreement between LHI and Defendants and the failure of Defendants to disclose either before or after the Agreement was entered into that (a) they had not obtained the consents and approvals of all Farm

7

Shopping Center owners necessary to permit construction of the Proposed Hotel, and (b) Defendants were in the process of selling the remaining parcels of property to a new owner whose approval and consent would also be required, were material omissions." [*Id.*].

LHI alleges that in entering into the Agreement, it relied on the truth of defendants' representations, "express and implied, in the telephone conversation of November 28 or 29, 2005 and in Defendants' December 6, 2005 correspondence." [*Id.*]. LHI alleges damages in excess of $10,000 due to delays in its ability to develop the property to include the proposed hotel and otherwise use the property as it intended. [*Id.*].

### IV. Analysis

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court clarified this standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), ruling that to withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted). On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

Under the *Twombly* standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008), quoting *Ridge at Red Hawk, L.L.C. v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original). "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1965 (internal quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*.

Although the new *Twombly* standard is "less than pellucid," the Tenth Circuit Court of Appeals has interpreted it as a middle ground between "heightened fact pleading," which is expressly rejected, and complaints that are no more than "labels and conclusions," which courts should not allow. *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief. *Robbins*, 519 F.3d at 1247. "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id*. at 1248. The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context. . . .[and] the type of case." *Id*. (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008)). A simple negligence action may require significantly less allegations to state a claim under Rule 8 than a case alleging anti-trust violations (as in *Twombly*) or constitutional violations (as in *Robbins*). *Id*.

### A. Breach of Contract Claim

LHI has alleged defendants breached three provisions of the Agreement: §§7.1.1, 11.10

9

and 7.1.2. Defendants assert LHI's second claim for breach of contract fails to meet the requirements of plausibility set forth in *Twombly*.

Under Oklahoma law, the language of a written contract governs the rights and obligations of the contracting parties. *Renberg v. Zarrow,* 667 P.2d 465, 471 (Okla. 1983). The interpretation of a written contract is a matter of law for the court to decide. *Southern Corrections Systems, Inc. v. Union City Public Schools,* 64 P.3d 1083, 1087 (Okla. 2002); *Public Service Co. of Oklahoma v. Burlington Northern R. Co.,* 53 F.3d 1090, 1096 (10th Cir. 1995).

### 1. Alleged Breach of §7.1.1

Section 7.1.1 of the Agreement states:

> Prior to Closing, Seller shall obtain all such written consents and approvals as may be required in order to permit Seller to perform its obligations under this Agreement.

LHI, in its Second Amended Complaint, alleges this section "addresses, among other things, the promises, assurances and representations made by Shindler and Defendants to LHI in November 2005." [Doc. #111, ¶29]. However, by its clear, unambiguous terms, the provision refers only to "obligations under the *Agreement.*" The Agreement is devoid of any requirement that defendants obtain approvals or consents from other property owners in Smith Farm Shopping Center prior to closing. LHI attempts to bootstrap the alleged oral agreement of November 2005 into the Agreement. However, at least two provisions of the Agreement disclaim prior oral agreements and promises. Specifically, Article X of the Agreement states:

> This Agreement and the exhibits attached to this Agreement contain the entire agreement between the parties, and no promise, representation, warranty, or covenant not included in this Agreement has been or is relied upon by either party. Each party has relied upon its own examination of this full Agreement and the provisions hereof, and the counsel of its own advisors, and the warranties, representations, covenants, and agreements expressly contained in this Agreement. No modification or amendment of this Agreement shall be of any force or effect

unless made in writing and executed by both Seller and Purchaser....

[Doc. #111-1, Agreement, Art. X]. Additionally, § 7.4 of the Agreement states in all capital letters:

> 7.4 EXCEPT HAS SET FORTH IN THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED THAT *SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE* (OTHER THAN SELLER'S WARRANTY OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING), ZONING, TAX CONSEQUENCE, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATIONS, GOVERNMENTAL APPROVALS OR REGULATIONS, MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO OR THE STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, PHYSICAL OR ENVIRONMENTAL CONDITIONS, THE VALUE, CONDITION, MERCHANTABILITY, PROFITABILITY, *SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY. EXCEPT AS SET FORTH HEREIN, PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER OR ANY AGENT OF SELLER. PURCHASER REPRESENTS THAT IT IS A KNOWLEDGEABLE PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS IN PURCHASING THE PROPERTY. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY,* INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY UPON SAME. UPON CLOSING PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. *EXCEPT AS SET FORTH HEREIN, PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS," WITH ALL FAULTS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD*

*PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL EXPRESSLY SURVIVE THE CLOSING, NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND SHALL BE INCORPORATED INTO THE SPECIAL WARRANTY DEED, SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN.* PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THIS SECTION 7.4 WERE A MATERIAL FACTOR IN THE DETERMINATION OF THE PURCHASE PRICE FOR THE PROPERTY.

[Doc. #111-1, Agreement, § 7.4 (emphasis added in italics)].

Additionally, the Agreement required the Seller to issue to Purchaser a Commitment for an Owner's Policy of Title Insurance listing all exceptions which would appear in the Owner's Policy of Title Insurance when issued, and a survey. [Doc. #111-1, §§ 4.1, 4.2]. The Purchaser then had 30 days to review the Title Commitment and Survey (the "Review Period"), during which the Purchaser could attempt to resolve exceptions to the Title Commitment or matters in the Survey that were unacceptable to the Purchaser. [*Id.,* § 4.3]. The Agreement provided that Seller would not be responsible for curing title and/or survey objections. [*Id.*]. The Agreement stated: "Upon the expiration of said Review Period, Purchaser shall be deemed to have accepted all exceptions to title referenced in the Title Commitment and all matters shown on the Survey, as the same may be revised by the Title Company and/or the Surveyor, respectively, and all matters shown on the Title Commitment and the Survey shall be '**Permitted Exceptions**' ... " [*Id.*] Thus, the Agreement gave the Purchaser an opportunity to examine and investigate title issues and directly placed on it the responsibility for resolving to its satisfaction exceptions to the Title Commitment.

The court rejects the interpretation of §7.1.1 urged by LHI. The Agreement did not

12

impose on defendants the responsibility for obtaining the consents and approval of other property owners in Smith Farm Shopping Center.

### 2. Alleged Breach of §11.10

LHI alleges defendants breached §11.10 by "failing to amend the EC&Rs so as to permit construction of the Proposed Hotel." [*Id.,* ¶33]. Section 11.10 of the Agreement provides:

> In addition to the acts and deeds recited here and contemplated to be performed, executed and/or delivered by Seller and Purchaser, Seller and Purchaser agree to perform, and/or deliver or cause to be performed, executed and/or delivered at the Closing or after the Closing any and all such further acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby in accordance with the terms hereof.

[Doc. #111-1, Agreement, §11.10]. The Second Amended Complaint alleges that "[t]he transaction contemplated in the Agreement, as identified in Section 5.2, was the purchase and sale of the Property for development of the Proposed Hotel, the parameters of which had been disclosed in all material respect to Defendants in October 200[5]." [Doc. #111, ¶30]. Section 5.2 of the Agreement, however, simply gives the purchaser a 75-day period within which to perform inspections and reviews to determine the feasibility of building a hotel on the property. It imposes no obligation on the Seller to obtain consents and approvals from other property owners or amend the EC&Rs. LHI's effort to import into the Agreement the alleged oral agreement of November 2005 must be rejected.

### 3. Alleged Breach of §7.1.2

LHI alleges defendants, by entering into the Second Amendment without obtaining LHI's written consent, violated §7.1.2. [Doc. # 111, ¶32]. Section 7.1.2 of the Agreement provides:

> Seller shall not enter into any leases, encumbrances, or other arrangement pertaining to the Property without the prior written consent of Purchaser, other than for routine

13

maintenance and proper care, repair or maintenance of the Property.

[Doc. #111-1, §7.1.2]. By LHI's own admission, the Second Amendment, which was executed by all requisite property owners as of May 17, 2006, "reflect[ed] their consent to construction of a hotel on the Property." [*Id.,* ¶18]. The approval and consent of other property owners was precisely what LHI was seeking, according to the Second Amended Complaint. [*Id.,* ¶16]. Thus, LHI's legal contention that defendants violated §7.1.2 by attempting–albeit unsuccessfully–to do what LHI contends they had promised in November 2005 to do lacks plausibility. Accepting as true the allegations of the complaint, LHI has no "reasonable prospect of success" on its claim that defendants breached §7.1.2 by procuring the Second Amendment without LHI's prior written consent. *See Robbins,* 519 F.3d at 1248.

Additionally, the Second Cause of Action for breach of contract fails to state a claim because the remedy sought–actual, consequential and incidental damages–is precluded by § 8.1 of the Agreement, which states:

> In the event that Purchaser is not then in default of any of the covenants and/or agreements to be performed by Purchaser under this Agreement and Seller breaches any of the covenants and/or agreements which are to be performed by Seller under this Agreement, Purchaser may, as its sole and exclusive remedies for such material breach either (i) terminate this Agreement by giving written notice of termination to Seller . . . and receive a full and immediate refund of any and all Earnest Money or (ii) Purchaser shall have the right to enforce specific performance of Seller's covenants and/or agreements to be performed by Seller under this Agreement. Except for the remedies provided above and the recovery [of attorney fees and costs of litigation] permitted in Article X below, Purchaser hereby specifically waives any right to pursue any other remedy at law or at equity for such default by Seller.

[Doc. #111-1, Ex. B, Agreement at §8.1]. Under the Agreement, LHI's remedies are termination of the Agreement or specific performance of Seller's covenants; an award of

14

damages is precluded.

## B. Constructive Fraud Claim

Constructive fraud in relation to contracts is statutorily defined as follows:

Constructive fraud consists:

1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,

2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

15 O.S. § 59. Constructive fraud "may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage for the actor by misleading another to his prejudice." *Patel v. OMH Medical Center, Inc.,* 987 P.2d 1185, 1199 (Okla. 1999). Constructive fraud does not require an intent to deceive, and liability for constructive fraud may be based on negligent or even innocent misrepresentation. *Id.* n. 49 (citing *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 358 F.Supp. 449, *aff'd,* 509 F.2d 1043, 1047 (6th Cir. 1975) and *Phillips v. Ball,* 358 P.2d 193, 197 (Okla. 1960)).

The Second Amended Complaint alleges defendants are liable for constructive fraud because LHI fully advised defendants of its plans to construct a hotel on the property and defendant Shindler represented to LHI that all consents and approvals from other property owners in Smith Farm had been obtained. The Second Amended Complaint, however, fails to allege any facts giving rise to a legal *duty* on the part of defendants. LHI contends a duty arose by virtue of the contract. [Doc. #126 at 21]. As previously noted, though, Article X and § 7.4 of the Agreement expressly exclude prior oral promises and agreements. Thus, contrary to LHI's

assertion, the contract does not give rise to any duty regarding prior representations.

LHI also argues the parties had a fiduciary relationship. [Doc. #126 at 21]. "Fiduciary relationships are not limited to any specific legal relationship, but can arise anytime the facts and circumstances surrounding a relationship would allow a reasonably prudent person to repose confidence in another person." *Quinlan v. Koch Oil Co.,* 25 F.3d 936, 942 (10th Cir. 1994) (quoting *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 730 (10th Cir. 1991). "Thus, Oklahoma law would recognize a fiduciary duty arising out of a commercial contract if the transaction involved facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arms length commercial contract." *Id.* (Citing *Devery Implement,* 944 F.2d at 730).

Noting that the terms "confidential relationship" and "fiduciary relationship" are generally synonymous, the Oklahoma Supreme Court has stated:

> "Confidential relation" is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the "confidential relation" is a conclusion of law; in others, as parent and child, it is a question of fact to be established by the evidence.

*In re Estate of Beal*, 769 P.2d 150, 155 (Okla. 1989) (quoting *In re Null's Estate,* 302 Pa. 64, 153 A. 137 (1930). The court observed that confidential relationships can exist between bank officer and borrower, employer and employee and brothers. *Id.* at 155.

Here, however, LHI has failed to plead facts supporting its assertion that a fiduciary or

16

confidential relationship existed. By its own statements in the Second Amended Complaint, LHI is "in the business of building and operating hotel properties in the State of Oklahoma," while defendants are in the business of "owning, operating, managing, marketing and developing commercial real estate in the southwest United States, including Oklahoma." [Doc. #111, ¶¶1-4]. The Agreement clearly set forth the rights and obligations of the parties with respect to the sale and purchase of the property at issue, and § 7.4 expressly disclaimed "ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY," and stated, "PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY." It further stated, "PURCHASER REPRESENTS THAT IT IS A KNOWLEDGEABLE PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS IN PURCHASING THE PROPERTY." [*Id.*]

LHI's allegations, viewed in conjunction with the Agreement, do not support a conclusion that on the defendants' side there was "overmastering influence" and on LHI's, "weakness, dependence or trust, justifiably reposed." *In re Estate of Beal,* 769 P.2d at 155. *See also, Carter v. RCB Bank,* 177 B.R. 951, 957 (N.D. Okla. 1994) (Where oral offer to make loan and acceptance, but written loan agreement contained additional, oppressive terms, the court held that the loan agreement was finalized on terms that the borrowers were fully aware of and the bank did not breach the loan contract or any legal or equitable duty which would give rise to a separate cause of action.).

17

The Second Amended Complaint alleges facts which, if true, do not establish a duty (whether based on contract, a fiduciary or confidential relationship, or otherwise between the parties) on the part of defendants to LHI. Thus, LHI has failed to state a cognizable claim for constructive fraud.

V. **Conclusion**

Defendants' Motion to Dismiss [Doc. #116] is granted with respect to the Second Cause of Action for breach of contract and the Third Cause of Action for constructive fraud. The motion is denied with respect to the First Cause of Action for fraud.

ENTERED this 1st day of June, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma